May it please the Court, the Magistrate Judge's summary judgment in this federal income tax refund case that's before you now must be reversed because it rests upon a fatally flawed premise. That is that because the $52 million in free financial aid that was paid by Baker Hughes' predecessor to its Russian subsidiary was not a loan, it somehow did not qualify for a bad debt deduction. And because this $52 million supposedly was not tethered to some underlying 162 deductible expense of the Russian subsidiary, it couldn't be an involuntary contribution to capital and non-deductible. That premise is legally incorrect and it doesn't square with the unique, undisputed facts of this case. Those unique facts begin in September of 2008 when BJ Services, the corporate parent of the Russian subsidiary Zal Frackmaster Samotnaya, or BJ Russia, made the corporate decision to shut down BJ Russia in July of 2009 as soon as BJ Russia could complete its contract with the Russian national oil company TNK BP. That same month, BJ Russia notified TNK in writing that it was not going to bid on a new contract. It was not going to extend the contract and it wasn't going to perform any more work for TNK after July of 2009. Perhaps coincidentally, six weeks later, the Russian Ministry of Finance threatened to liquidate BJ Russia. When BJ received that liquidation letter, it had the same interpretation as did the government's expert in this case, that it was effectively a demand for BJ to perform on the separate performance guarantee BJ had given to TNK back in 2006. And that's because appointing a liquidator results in, under the TNK contract, TNK's right to immediately terminate the contract. Termination of the contract means that BJ is required, legally obligated, to perform under its performance guarantee. Performance of the performance guarantee in this case only could be done by the payment of money, by payments to satisfy the guarantee. That's because BJ had no physical operations in Russia or any ability to complete the contract if BJ Russia no longer existed. And there were no other viable alternatives here. New stock couldn't be issued because that would take at least three to four months, assuming the Russian Federation approved it. There was no way to make a loan here because that didn't satisfy the conditions of the liquidation letter. BJ couldn't simply cut a check to BJ Russia and satisfy the problem. The problem here wasn't that they'd have to deal with the Russian profits tax. That's just another $15 million. The problem was that the Russian currency controls were going to tie up a direct check from the United States to a Russian entity for potentially years, according to BJ's treasurer. And so the situation that BJ faced was it had two options. One option was to wash its hands, walk away, let the performance guarantee be called. That was going to result in catastrophic losses and damages to BJ. Calculated by BJ at $160 million, the government's expert thinks it's $200 million. And it was going to be an incalculable loss to its global business reputation along with the financial damages. And yet, there's no dispute here, had BJ walked away and done that, that would have been deductible. Instead, what BJ did was, again, making payments on the performance guarantee by doing the pre-financial aid, what that did was, with the dominant motivation to preserve its status as a global worldwide fracking company and keep its reputation, which has never been disputed, in order to effectuate an orderly wind-down of a company, it has already said it's going to close, and in order to effectuate a discharge of its obligations under the guarantee, which the guarantee specifically said would be discharged when the contract was performed in July of 2009. Counsel, you're certainly right that there are some very difficult choices being given to your client. Whether the tax code is going to help them out on all of them is the only real question for us. But I certainly understand why you did what you did or your client did. This argument about performance guarantee, it does seem to me that the government's got a good starting point on that. The performance guarantee was for the local Russian company, BP, being part of that company, to make sure that it performed its obligations under the contract. It seems like your argument is indirect, that the performance guarantee was being upheld in a fairly indirect manner. You enabled that performance to occur by this infusion of the capital, it does seem to me, but maybe we can characterize it as something else under the tax code. How is this? Just work some more on explaining this. Why is this a, you have other arguments, too, but specifically on the performance guarantee, why is this a fulfillment of the performance guarantee? How are you performing in a way that guarantee requires? The guarantee, Judge Southwick, required BJ to stand behind the performance of the TNK contract. That contract could not be performed if a liquidator is appointed, as was threatened. BJ Russia couldn't get to the starting line to perform that, and so there is a direct correlation between the payments that are made on the free financial aid and the performance guarantee, because, as I indicated, there is no other way to perform the guarantee here except by making the payments. And so under the tax code, whether we look at 166 as a bad debt or 162 as a business expense, that's deductible. In fact, I think that you talked about the tax law, Judge Southwick, and part of the problem we have here, for example, with the 166 claim, is that the magistrate judge made three critical errors in how he analyzed that. The critical error number one was that he looked at this issue from the 13-factor estate of mixing test of debt versus equity. And that is not the test to be applied in a guarantee situation, and it's telling the government has never advocated in favor of that test. And the reason is, is because the 13-factor test looks at an advance at the time the advance is made, as opposed to a guarantee where you look at the time the guarantee is made. So what you're looking at is satisfaction of 1.166-9 of the treasury rates, which the briefing shows that we did. The second critical error the magistrate judge made was that he determined that there had to be an enforceable legal right of repayment in order for the guarantor to have a bad debt deduction. That hasn't been the law since 63 years, since the United States Supreme Court decided Putnam. And the Putnam line of cases runs through, for example, the Vaughn case, where the guarantor was precluded by the bankruptcy plan from having a right to repayment. And then the third critical error that he made was that the discharge has to have some kind of a written release. And I think this gets back to your question, Judge Southwick, about the relationship between the performance guarantee and the payments and how this is deductible, because the discharge was effectuated by the payments which allowed B.J. Russia to perform. There was no other way for B.J. Russia to perform because of this liquidation situation. It was going to be out. So at that point, the only way to perform on the performance guarantee was to make the funding payments. And that was the only way to obtain a discharge, because only by performing the contract. I don't think anybody can seriously say that B.J. was going to get some written release from the Russian oligarchs who ran T.N.K. That just wasn't going to happen here. And so the situation that it faced was this would be a bad debt as qualified. And really the government, because of the magistrate judge's errors, I think has tried to seize upon this argument that an underlying debt has to be a bona fide debt. That's not in the statute. It's not in the regulations. It's not in the case law. And that essentially eviscerates all the line of cases involving performance guarantees, performance bond guarantees and what have you. And so that's the 166 case dealing with the question you asked Judge Southwick. And let's look at the 162 case, which is looking at trying, are we going to, can we cabin this into an ordinary and necessary business expense? Five-factor test of Lincoln Savings. Only two are at issue here. Was it an expense and was it ordinary? And you made the comment, Judge Southwick, well, this sort of looks like a capital contribution. Well, let's look at what happened here. Fifty-two million dollars in funding payments were made. Absolutely no expectation of a return on that. This is a company, BJ Rush, that was bleeding losses. It hadn't made a profit in years. So there wasn't going to be any return. This money wasn't used, like in other cases that have held a voluntary contribution of capital, to put a new coat of paint on BJ Rush. It wasn't going to buy new equipment, come up with a new business plan, to have a new advertising campaign to go out and get new customers. This was for one thing and one thing only, to preserve the business reputation of BJ Services as a global worldwide provider of fracking services. And that would not be protected if this guarantee gets called. And that guarantee effectively had been called by the liquidation letter. So in questions, in the question regarding the voluntary contribution of capital, the whole line of cases, Fink, Schleppi, Mills, all of those cases involved, none of them involved where the dominant motivation of the shareholder was to preserve the business reputation of the company. And all of those cases involved situations where they were, had a desire to promote the future operations of the company by advancing capital. That was not BJ's motive here. It already had established the death sentence for BJ Rush in July of 2009 once that contract was completed. There is no other case that the, no case that the government has cited or can cite where a voluntary contribution of capital involved a situation where the company which received the funds was going to be preordained to be shut down. Not one case. Now that gets us back to the error that the magistrate judge made in 162 regarding this requirement of tethering the payments to an underlying 162 deductible expense. That's not in the case law. There's not any case that says that, because you're not required to, the requirement is, is for 162 is that your expense be deductible, not someone else's expense. It's your expense. Kennedy. It seems to me that your argument on that is, and you can give me the tax specialist pronunciation of it, but Lorkey, and it seems to me that there, when one company is paying the expenses of another and receiving the benefit under the 162, it is still an expense of the other company that is being paid, and you're not, you didn't pay any expenses of BJ Rush. So what is your best case? You don't need an expense at all in order for this to fall under an ordinary and necessary business expense. Well, the best cases are the ones that we cited, Allen, Lutz, and what have you, where they all involve situations where the, a shareholder makes an advance to a corporation in order to preserve its business reputation. You are looking at the character of the advance. Was that, was the motivation, that's why motivation is so critical here, was the motivation to preserve the business reputation? You're not looking at the underlying expense or obligation or what have you, but if you want to look at that, Judge Southwick, that's pretty simple to do here, because what we have is BJ Rush had significant underlying expenses. Those expenses were labor costs and crude oil costs. Those expenses had been fronted by the loan that had been made to BJ Rush. It was just cash funding those expenses. BJ could have theoretically just made periodic advances to pay those expenses, because that's what those were for. The $52 million was to keep this company alive so it could perform this contract which necessarily involved these expenses. So my response to that is, I thought, wouldn't that actually be a problem? The Russian government, whatever was behind all of that, was after BJ Rush because it was not sufficiently capitalized. And so if they spent the $52 million right away, they would have the same capitalization problem. So if they paid their expenses with it, how does that play out? Effectively, Judge Southwick, they did pay their expenses with it, because the $52 million repayment, a portion of the loan which had been for the expenses, they took care of it. It's just under the unique Russian law that satisfied the charter capital requirement that avoided liquidation. One time sufficient capital and then they can spend it down is what the Russian law required them to do? They required it. The Russian law required you to be within compliance for that year and then it goes. There's a following year and then the next year when they can do something about it. Well, BJ Rush was going to be done by then. And finally, in the limited time I have, I would direct the Court to Record Excerpt 6 in pages 46 and 47 of our opening brief where we discuss the IRS National Office Technical Advice Memorandum that is directly on point here with regard to the 162. May it please the Court, Jacob Christensen for the record, that the transfer of $52 million from BJ Rush to a Russian subsidiary in order to bring that subsidiary into compliance with Russian capitalization requirements was indeed a capital contribution and was not a deductible business expense or a bad debt expense. The effect essentially goes to one of timing. As the Supreme Court explained in the Fink case, capital contributions are not immediately deductible. Instead, the shareholder adds the basis of the property transfer to his own basis in the shares and the tax benefit results subsequently when the corporation is liquidated or the shares are sold. Your friend on the other side gets around that maybe in part. You can correct me when he comes back up by talking about motives and intent. There's a lot of that in the briefing on both of these points, 166 and 162. To what extent does motive intent go into your argument about capital contributions? They certainly were not looking at a future shareholder benefit of having more value to their shares by this company surviving. It was to keep it alive for the purposes we all understand and you understand better than maybe the panel does. So what about motivation and intent? That doesn't fit within your capital contribution normal rules. So the motivation for making that capital contribution is not relevant to whether the corporation is liquidated or not. It's a voluntary contribution. There is a treasury regulation that states, provides that voluntary contributions by shareholders to the capital of the corporation for corporate purposes are capital expenditures, but that's a subset of capital expenditures. A contribution to capital doesn't have to be voluntary. All the time there are involuntary contributions to capital. For example, it could be either by a corporation's governing documents that require shareholders to make contributions of capital, for example, when assets reach a certain minimum, or there might be statutes requiring shareholders to make contributions to capital such as in the banking industry. Those would be what I would call involuntary contributions, but they're still contributions to capital. The statute that defines the term capital expenditure is section 263, and it doesn't limit those expenditures just to voluntary capital expenditures, and what it states is that no deduction shall be allowed for any amount paid out for new buildings or for permanent construction. That's exactly what happened here. BJ Russia was given an infusion of cash to bring it into compliance with its capitalization requirements, which increased the value of BJ Russia. So these facts fall squarely within the definition of a capital investment under the statute, section 263. That said, the contributions in this case were indeed voluntary. BJ Parent was under no legal obligation to transfer free financial aid to its subsidiary. There had been no default under the contract, and BJ Parent was never called upon to perform by the counterparty, TNK. So in that sense, these contributions indeed were voluntary because there was no legal obligation for BJ Russia to transfer free financial aid. It did so for its own business purposes, or whatever those purposes may have been, in order to avoid the liquidation of BJ Russia, protect the assets, BJ Russia's assets from liquidation by the Russian government, but the point being that there was no legal obligation for BJ Russia to make those contributions, and that's important. There may be no motive or purpose requirement for the ordinary understanding of a capital contribution, but isn't the whole purpose of the so-called Lorkey exception that the first half of it does really matter why they made the $52 million cash transfer that they made? I mean, it literally says motive or purpose in the decision itself. Yes, and so our response to that, under the Lorkey exception to the general rule, motive would typically be the first step. Why have they made this payment? That's irrelevant here because there still has to be an underlying expense in order for there to be a currently deductible business expense. The statute says it. There must be an expense. The Supreme Court has said it. In this case, as the district court concluded, there was no expense that was extinguished by the transfer of the free financial aid to BJ Russia. What really happens, if you're missing the expense, what really is happening is you have a taxpayer that's basically taking money from one pocket and putting it into the other pocket. Shareholder taking money and contributing it to the corporation. Without the underlying expense is required by 26 section 162? Yes. Okay. Yes. And all of the cases, Your Honor asks, you know, what's the best case that an expense is not required? And my friend referred the Court to the case of Allen and this Court's decision in Luke's. Both of those cases involved expenses. In Allen, we've cited these in a brief. In Allen, the shareholder paid amounts, quote, for the purpose of providing payment in full to the corporation's general creditors. And in Lutz, the taxpayer was allowed deductions for, quote, amounts he paid and debts he assumed with respect to creditors, unquote, of the three controlled corporations. So in all the cases that Baker Hughes has cited in his brief, there was an actual underlying expense which justified the Court's conclusion in those cases under the Lorchie exception. Baker Hughes argues that by requiring an actual expense that the government is elevating form over substance. In fact, however, that's the Code's requirement. There must be an underlying expense. We're not elevating form over substance here. And I'd also point out that taxpayers, you know, once they choose the form of their transaction, they're bound by that form. You know, Baker Hughes could have decided to pay expenses of BJ Parent. And as Your Honor noted, that wouldn't have solved the capitalization problem of being undercapitalized. Baker Hughes could have done that, and then it would have had a stronger argument under the Lorchie exception. But Baker Hughes instead decided to transfer free financial aid to the subsidiary, untethered to any expense. Let me take that, maybe not another step, but explore that a little bit. Your friend on the other side closed just about by talking about that BJ Rusher did use the $52 million to pay for the expenses. To the extent Lorchie is the law that is particularly being discussed here, it does talk about the intent for the payment. And the intent by Baker Hughes, BJ Parent, as the briefs say, was to keep BJ Rusher alive because of the capital requirements that the Russian government was placing on him. It wasn't that the Russian government was coming after them because they weren't paying their expenses, they were not paying their bills. But if BJ Rusher turns around and uses that money to pay their bills, and that was to some extent the motivation by Baker Hughes, it seems like at least we're getting close to what Lorchie is talking about. If that was understood, I don't know if that's been argued particularly, I heard it today, that they would then use the money, they didn't have to keep it, that it was a one-shot infusion of capital and then they could do with it what they wanted as far as the Russian government was concerned. So respond to that musing. Thank you. Yes, you know, with any infusion of cash or capital contribution, eventually the intent is to use that asset or that cash to further the business of the company to which it's been given. So the fact that BJ Rusher ultimately used this cash to pay down a loan, you know, it could have used the cash for other reasons. It could have purchased assets. The record is clear that the cash could be used at BJ Rusher's discretion. And so, you know, with any capital contribution, eventually the company is going to use that for some purpose. The important thing here is that it wasn't BJ Rusher had discretion how to use that cash, which is the classic example of a capital contribution. And I think the other thing that BJ Rusher was or BJ Parent was wanting here was it wanted to reap Russian tax benefits. And that's why it chose the form of the transaction that it chose, a transfer of free financial aid that was unrestricted so that it could obtain Russian tax benefits. Had it instead used the money to pay third-party expenses, then it would not have been entitled to those Russian tax benefits. So BJ Rusher or BJ Parent specifically chose the form of its transaction for a purpose in order to achieve Russian tax benefits, and they did so, and of course is now bound by the form that they chose. This court and the Supreme Court has made clear that taxpayers, once having chosen the form of their transaction, can't later wiggle out of that form in order to achieve tax benefits. Well, why don't we look at the satisfaction of the performance guarantee that the parent had with BJ Rusher? Why isn't that what occurred here? So with respect to the bad debt deduction, the code and the regulations under Section 166 require that there be a bona fide debt. So the first problem with the taxpayer's argument in this case is that there's no bona fide debt anywhere. The regulations define what a bona fide debt is. Bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. The government hasn't argued that only a formal loan document qualifies under this definition. What's critical is that there be a debtor-creditor relationship that's based on a valid enforceable obligation to pay a fixed or determinable sum of money. And in all the cases that Baker Hughes cites in its brief that where a bad debt deduction was at, the company to which the money was paid, Cortland, I guess, was the recipient. Maybe I heard it backwards. It was stipulated that they were insolvent at the time. Is it your position insolvency itself doesn't necessarily legally preempt possible repayment at some stage? It seems to me that's a pretty good case for them that there was no expectation of repayment in Myers. So it is not the government's contention and the district court didn't decide that subrogation rights were required, or that a legal right to repayment was required in every case. What our argument is … We're not talking about a legal right. Regardless, I think, I don't remember now what the issue was on legal rights, but it seems to me there's no practical possibility of repayment in Myers. How does that … that seems to be the situation at least comparable to what we have here. So in Myers, when Myers went ahead and made payments to ensure that the construction projects were completed free of mechanical liens, there was a contract between Myers and Cortland wherein Cortland owed whatever amounts Myers had to pay out in order to make sure the projects were completed free of mechanical liens. So there was a contractual agreement that that amount would be repaid to Myers. But a contractual amount that was in a way irrelevant because Cortland was insolvent and unlikely ever to be able to perform. And because they were insolvent, the debt was worthless and that's why it qualified as a bad debt because Myers wouldn't be repaid that debt. But here, we're missing any … we're missing a debtor-creditor relationship or any agreement to pay a fixed or determinable sum of money to B.J. Parent. B.J. … I mean, the provision of free financial aid document itself states that there is no expectation of return. So in … You're saying there's no right of repayment or just no expectation? I mean, what is a free … I forget what the … free financial aid or whatever that stands for. Is it that there's no expectation or is there an obligation of some sort but no expectation? No, no. The contract wherein the funds were transferred states that makes it clear that the … the financial aid is free and that there is no expectation of repayment. I'm just trying to get to there's no right of repayment. The same way here that Cortland would … bad debts generally, there's no expectation of repayment in a lot of them and certainly in Myers, there was no expectation. But are you saying there's also no legal right that just would not be performed? Correct. Because … because here, it was clear that the aid was free and that there was not being a debt that was created. And this is … this is how the district court distinguished Myers. Because in Myers, there was actually a contract that said that Cortland had … was contractually obligated to repay amounts that Myers paid. And here, that's missing. Again, the element of a bona fide debt is missing. Baker Hughes cites some lease cases arguing that they support Baker Hughes' position that there doesn't need to be a bona fide debt. In fact, when there's a lease agreement and rent's unpaid, the unpaid rent is a fixed or determinable amount that's owed, and so therefore there … there is a bona fide debt in those lease cases. Baker Hughes on page 8 of their reply brief also cites some bid performance cases. In those bid performance cases, the taxpayers were shareholders of a corporation that was doing construction work, and there was a bonding company that provided a bond. The shareholders, the taxpayers of the corporation, agreed to indemnify the bonding company for any payments that the bonding company had to make or any losses they incurred in connection with the construction contract. So the bona fide debt in that case was the indemnity agreements where the shareholders agreed that they would pay the bonding company any amount or any losses that the bonding company incurred as a result of the construction project. So again, those cases further illustrate the point that a bona fide debt is required. And this Court has held as much in the Piggybank Station's case that a bona fide debt is required under Section 166. Before your time expires, can we go back to 162? I want to make sure I understand the argument on the expense, because we agree under Lorchie if they have a purpose or a motive to satisfy the first part of the test, then the next question is, is it an ordinary business expense, right, and it's a business expense of the taxpayer, right, BJ Parent? Or does it have to be an ordinary expense of BJ Russia? Well, what the Lorchie decision says is that it has to, you know, it describes the exception as being an expenditure that arises out of a transaction engaged in by the other taxpayer. BJ Parent here? No, BJ Russia. BJ Russia, okay. That would have given rise to a deduction for that taxpayer, BJ Russia. If it were the taxpayer. If, yeah, correct. And so the Lorchie description as it's described in the Lorchie case is speaking of an expense of the other taxpayer, so. And why is the demand on BJ Russia not sufficient to be an expense? I mean, the letter from the requirement or else sure seems like an obligation to make the capital. So the requirement was that their capital assets be increased, but that doesn't involve any expense. It's just an increase in assets. But it would have been an expense if a creditor had made the same demand, right? Like if a bank said that and said, you know, make the capital contribution or raise your capital levels to a certain thing or we're going to, you know, take a property or we're going to make a loan, obviously that would satisfy. The argument is that somehow this is different. Well, I don't, I don't see how, where the expense is because, you know, BJ Russia is being asked to increase its assets or else we're going to liquidate you. So that's a capitalization requirement. And that was solved in this case by an infusion of capital. But there's still, there's no, there's no underlying expense. And I guess actually, if I might, just one more question. That's actually my question for you is what would you require for an expense of BJ Russia to satisfy the second half of the Lorkey exception? So if there had been, it could be any expense. It could be, I mean, in the cases that have been cited, there have been loans owed to third party creditors or, you know, marketing expenses to third parties. But if BJ Russia owed us $52 million loan to the creditor named the Russian government, that would be sufficient? If the owed a loan and BJ Parent, instead of giving the cash to BJ Russia, had paid off the Russian government, that would be a stronger case under the Lorkey exception. Thank you, Counsel. Thank you. In response to the points that Judge Sanflake and Judge Oldham were making about motive and intent, they're absolutely paramount here. Because all of the cases dealing with the Lorkey exception have to determine what was the dominant motive of the shareholder in making the advance? What was the predominant motive of the shareholder in making this payment? You have to know what that was in order to know whether or not the Lorkey exception applies. Motive and intent also are particularly important when we're dealing with the relationship between the performance guarantee and the payments. You have to know those things. And the government never questioned the motive of BJ in doing what it did. With respect to the questions about the satisfaction of the performance guarantee and the response of the government that there was no bona fide debt because we hadn't complied with 166-9, a debtor-creditor relationship was established when the funding payments were made. That put BJ Russia in the position of a debtor. There was an enforceable, a valid and enforceable obligation, the performance guarantee. Nobody's questioned it was valid and enforceable under Russian law. And there was a fixed and determinable sum of money, $52 million. So there shouldn't be any question about that, about that being a bona fide debt. On the point about the expense and the questions that Judge Oldham, you and Judge Southwick asked the government, the motive there is not just the first step. It is the step. You have to know whether or not that's the dominant motive. And what's being paid here, we know what got paid here, $52 million. We know what that got used for, partial repayment of the loan. We know what that loan was. It was for crude oil costs and labor costs of BJ Russia. There's no dispute about any of those things. And that's the problem with the magistrate judge's summary judgment was that he respectively kind of looked for little Myers is a perfect example, what you were asking about Judge Southwick, where the magistrate judge says, well, Myers can be distinguished because there was this contract that had a right of reimbursement. That wasn't how the tax court decided that case. It looked at the practical issue of the fact that Cortland Holmes was insolvent. There was no way it was going to be able to repay anything. And it recognized the obvious from the line of don't have to have a legal right of reimbursement. The question is, is what is the status at that time of the debtor? Well, we know what the status of BJ Russia was. It was on the books, insolvent. It was bleeding losses. So we have here a bad debt deductible under 166 or an expense under 162 for this $52 million that results in a $17.6 million refund plus interest here. And that's consistent with good policy here, because otherwise we're putting companies like, you know, like BJ in a position where they have to wait for the parade of horribles to pass. That makes no sense, and it's not good policy. So for those reasons, we would respectfully request that the judgment below be reversed. All right, counsel. You've given us an interesting case, both of you. We appreciate your assistance this morning. I'll call the final case for the day and the week. Texas Brine Company versus American Arbitration Association and others.